UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Crim. No. 09-34 (JNE/SRN) |
| Plaintiff, | |
| v. | **REPORT &** |
| | **RECOMMENDATION** |
| Ewell Dennis Nash, | |
| Defendant. | |

Clifford Wardlaw, Office of the United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, for Plaintiff United States of America

Andrew Mohring, Office of the Federal Defender, 107 United States Courthouse, 300 South Fourth Street, Minneapolis, Minnesota 55415, for Defendant

SUSAN RICHARD NELSON, United States Magistrate Judge

The above-captioned case comes before the undersigned United States Magistrate Judge on Defendant's Motion to Suppress Evidence (Doc. No. 52) and Motion to Dismiss Indictment (Doc. No. 61).

This case has been referred to the undersigned for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1.[1]

## I. FACTUAL BACKGROUND

Defendant is charged with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1). (Indictment, Doc. No. 7.) Testifying at the criminal motions hearing were Officers Oscar Macias and Kristina Bottolfson of the Minneapolis Police

---

[1] The Court has addressed Defendant's non-dispositive motions in a separate Order.

Department and Special Agent Martin Siebenaler of the Bureau of Alcohol, Tobacco and Firearms. Defendant submitted the following two exhibits: Defendant's Exhibit 1 – a hand-drawn map of a business located at 25th Street and Chicago Avenue in Minneapolis, with handwritten notations by Officer Macias; and Defendant's Exhibit 2 – a hand-drawn map of a business located at 25th Street and Chicago Avenue in Minneapolis, with handwritten notations by Officer Bottolfson. The Government offered no exhibits.

### A. Officer Macias's Testimony

Officer Oscar Macias, a uniformed Minneapolis police officer, testified that while on patrol on October 23, 2008, shortly before 7:00 p.m., he received a dispatch call. The call alerted him that a person with a gun was inside a store in the 2500 block of Chicago Avenue South. The caller identified the person with the gun as a white male.

Officer Macias's car was the second police car dispatched to the scene. When he arrived, officers had detained a white male in the middle of the intersection of 25th Street and Chicago Avenue. Officer Macias did not speak with the white male in the street, but learned that this person had placed a 911 call, leading to the police dispatch. The 911 caller identified the person with a gun inside the nearby store as a black male wearing a red jacket and a Baltimore Orioles baseball cap.

Officer Macias approached the nearby store, which he described as a grocery store with a connected deli or restaurant. According to the officer, although it was dark outside at approximately 7:00 p.m., the store was well-lit within and he could see clearly into the windows of the business. Looking in the window, Officer Macias testified that he observed two black males inside the grocery – one wearing a red jacket and the other wearing an Orioles baseball

cap. According to Officer Macias, there was not an individual black male wearing both a red jacket and an Orioles cap. Officer Macias observed the man in the Orioles cap, whom he positively identified in Court as Defendant, move from the grocery side of the business to the deli, along a walkway between the two sides of the business. Officer Macias therefore moved along the sidewalk closer to the deli in order to afford a view of Defendant. Officer Macias testified that he was accompanied by fellow Minneapolis Police Officer Bottolfson. Two other officers focused their attention on the man in the red jacket.

Officers Macias and Bottolfson entered the deli, at which point Officer Macias was physically close to Defendant. Officer Macias made eye contact with him and described Defendant as "nervous." Officer Macias testified that he told Defendant to relax and that he would explain what was going on. Worried that Defendant had a gun, Officer Macias noted that Defendant's left hand was placed in his left pants pocket, while his other hand was at his side. When Officer Macias asked him to take his hand out of his pocket, Defendant allegedly stated, "oh shit," then turned and ran along the walkway connecting the deli to the grocery.

Officer Macias pursued Defendant and deployed his taser. He also testified that he saw no outward visual evidence that Defendant had a gun nor did he know that Defendant was a felon. The officer's taser made partial contact with Defendant, but he continued to run. Ultimately, Defendant slipped and fell, at which point Officer Macias got on top of him and demanded that Defendant show his hands. Officer Macias testified that Defendant refused, leading to a struggle. Officer Macias applied a "drive stun, " i.e., deploying his taser without firing projectiles, to Defendant' back. Officer Macias testified that this technique proved ineffective because of the thick clothing worn by Defendant, so he applied the taser to his face.

At that point, Defendant complied with the officer by showing his hands. Another officer conducted a search of Defendant. Officer Macias testified that when a gun was located on his person, Defendant volunteered, "What is that? This is not mine, this is a set up."

### B.   Officer Bottolfson's Testimony

Officer Kristina Bottolfson testified that shortly before 7:00 p.m. on October 23, 2008, she received a dispatch about a white male with a gun in a business at the intersection of 25th Street and Chicago Avenue. Officer Bottolfson testified that when she arrived there, she made contact with a person standing in the middle of the intersection, which was closed for construction. The person in question was a white male, holding an object, later determined to be a cell phone, who appeared to be upset and nervous. Officer Bottolfson testified that, for officer safety, she approached the man with her gun drawn and ordered him to the ground, where she pat searched him. She found no weapons. Upon learning that this man had called 911, Officer Bottolfson questioned him and learned that he had seen a black male with a gun, wearing a red shirt and Orioles baseball cap inside the nearby grocery store/deli.

When Officer Bottolfson looked into the windows of the grocery store, she observed two black males – one man wore a red shirt and the other man wore an Orioles baseball cap. At the criminal motions hearing, Officer Bottolfson identified the man in the Orioles cap as Defendant. When Defendant moved toward the deli side of the business, Officer Bottolfson moved alongside the windows, outside, in the direction of the deli.

Next, Officer Bottolfson entered the deli directly behind Officer Macias. Officer Bottolfson testified that when Officer Macias made verbal contact with Defendant, he appeared nervous and ran to the other side of the store. Officer Macias was armed with a taser and Officer

Bottolfson testified that she had her gun drawn, at her side. When the suspect ran, Officer Macias deployed his taser, but Defendant continued to run and the officers pursued him. According to Officer Bottolfson, the officers caught up with Defendant in the walkway area between the two businesses where he had fallen to the floor. Officer Bottolfson described Defendant as non-cooperative. While Officer Macias struggled with Defendant, Officer Bottolfson provided back-up and Defendant eventually became cooperative once he was handcuffed.

Officer Bottolfson patted down Defendant for weapons, due to the nature of the gun call, she testified. She testified that she was concerned for the safety of customers and other police officers. During the pat search, she felt a hard metal object under Defendant's shirt, in the waistband area. She retrieved the object, which was a small black revolver. Officer Bottolfson testified that if Defendant said anything, she did not hear it because she was concerned about taking control of the weapon and getting a bag for the gun.

### C. Special Agent Siebenaler's Testimony

Special Agent Martin Siebenaler of the Bureau of Alcohol, Tobacco and Firearms testified that he listened to phone calls made by Defendant when Defendant was initially booked into the Hennepin County Jail. Special Agent Siebenaler testified that the recording of jailhouse calls is routine and that persons participating in the calls are informed that the calls are subject to monitoring and recording.

Also, Special Agent Siebenaler testified that he investigated the background of the gun found on Defendant. Special Agent Siebenaler obtained the gun's serial number and traced its manufacture to the 1920's or 1930's in Massachusetts. Special Agent Siebenaler testified that he

had found no evidence that Defendant personally transported the gun across state lines into Minnesota.

## II. DISCUSSION

### A. Suppression of Evidence Obtained as a Result of Search and Seizure

Defendant moves to suppress evidence obtained as a result of the October 23, 2008 search and seizure, arguing that the search and seizure was conducted without a warrant, without probable cause and lacked any exigent circumstances.

In Terry v. Ohio, 392 U.S. 1 (1968), the Supreme Court held that a police officer may stop and briefly question a person if the officer has a reasonable and articulable suspicion that the person has committed or is about to commit criminal activity. Id. at 21-24. A reasonable, articulable suspicion means that there are specific and articulable facts, and rational inferences drawn from those facts, reasonably suggesting that criminal activity has occurred or is imminent. Id. at 21. An officer may rely on information known by a team of officers involved in an investigation to provide justification for a Terry stop. United States v. Ortiz-Monroy, 332 F.3d 525, 529 (8th Cir. 2003) (citing United States v. Robinson, 119 F.3d 663, 666-67 (8th Cir. 1997)).

The Court finds that the officers in this case had, at minimum, a reasonable and articulable suspicion of criminal activity. They knew from the police dispatcher that a 911 caller had described a person with a gun in a store located at 25th and Chicago. While the police dispatch described the suspect as a white male, the officers quickly learned that the suspect was instead a black male, by talking to the 911 caller at the scene. The 911 caller was standing directly outside the store in question, in the middle of the intersection of 25th and Chicago. The

interior of the grocery store/deli was well-lit.  In addition, the 911 caller provided the arriving officers with a description of the suspect's clothing, stating that the suspect was wearing a red jacket or shirt and a Baltimore Orioles baseball cap.  These are specific and articulable facts that suggested the occurrence of criminal activity and the 911 caller provided a contemporaneous description of the suspect.

In United States v. Terry, 400 F.3d 575 (8th Cir. 2005), a 911 caller told a police dispatcher that a man in a yellow truck was causing a disturbance and trying to enter the caller's home. Id. at 580. The Eighth Circuit found that this information provided responding officers with a reasonable and articulable suspicion that criminal activity was afoot, thus justifying a stop of the truck and requiring the suspect to exit the vehicle. Id. at 578, 580.  A decision from the Ninth Circuit, United States v. Terry-Crespo, 356 F.3d 1170 (9th Cir. 2004), is also illustrative. In that case, the court found that a 911 caller had provided the police with sufficient reasonable suspicion to justify a Terry stop because the caller was not anonymous; the call involved an ongoing, exigent situation that required a prompt response; and the caller had personally and recently observed the offense. Id. at 1174-77.

In the instant case, although the 911 caller's identity is not part of the Court's record, the arriving officers verified that the white male standing outside the store was the 911 caller, who had personally and recently observed a black male with a gun inside the store.  He further stated the suspect wore an Orioles baseball cap and a red shirt.   The 911 caller therefore provided sufficient information, much of it predictive, subject to verification and on-site questioning, to the police. "[I]f a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more

7

reliable." Alabama v. White, 496 U.S. 325, 330 (1990).

Furthermore, the officers were able to corroborate details of the call before approaching Defendant. They saw two black men, one dressed in red, the other wearing an Orioles baseball cap. Although there was no individual black male who wore both a red shirt or jacket and an Orioles baseball cap, as the 911 caller had described, two police officers observed the man in the red shirt or jacket and two different officers observed the man in the Orioles cap. Officer Macias observed that Defendant, wearing an Orioles baseball cap, had one hand in his pocket, indicating to Officer Macias that he might have a gun. This corroboration, although ostensibly small, added to the already reasonable suspicion that Defendant had engaged or was engaging in the criminal activity reported by the 911 caller. See id. at 331 (finding reasonable suspicion based on officers' corroboration that a woman left a certain building and got into a certain vehicle). Additionally, the 911 call, indicating the presence of a handgun, coupled with the officer's independent suspicion that Defendant was concealing a gun on his person, would certainly qualify as an exigent situation requiring a prompt response.

When Officers Macias and Bottolfson approached Defendant and Officer Macias made verbal contact with him, Officer Macias testified that Defendant stated, "oh shit," then Defendant turned away and ran, further arousing the officers' suspicion. "Nervous, evasive behavior is another pertinent factor in determining reasonable suspicion, e.g., United States v. Brignoni-Ponce, 422 U.S. 873, 885 (1975), and headlong flight is the consummate act of evasion." Illinois v. Wardlow, 528 U.S. 119,120 (2000). As the Supreme Court held in Wardlow, the officer in that case was justified in suspecting that Wardlow was involved in criminal activity when he fled, and, therefore, in investigating further:

8

> While flight is not necessarily indicative of ongoing criminal activity, Terry recognized that officers can detain individuals to resolve ambiguities in their conduct and thus accepts the risk that officers may stop innocent people. If they do not learn facts rising to the level of probable cause, an individual must be allowed to go on his way. But in this case the officers found that Wardlow possessed a handgun and arrested him for violating a state law.

Wardlow, 528 U.S. at 119. Defendant's flight is therefore another factor, coupled with the corroborating observations of the officers and the exigent circumstances, in determining reasonable suspicion. After apprehending him, Defendant further ignored Officer Macias's demands that he show the officers his hands.

Once the officers had handcuffed Defendant, Officer Bottolfson conducted a limited pat down search for weapons. She testified that she conducted the search out of concern for officer safety and public safety. A police officer may also make a limited warrantless search in order to discover weapons if the officer has a reasonable, articulable suspicion that a person might be armed and dangerous. See, e.g., Terry, 392 U.S. at 1. The test under Terry is an objective standard: the officer need not be absolutely certain that the suspect is armed, but must establish that a reasonably prudent man in the circumstances would be warranted in the belief that his safety or the safety of others was in danger. United States v. Roggeman, 279 F.3d 573, 577-78 (8th Cir. 2002) (citations omitted). "The sole justification of the search . . . is the protection of the police officer, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Terry, 392 U.S. at 29. Any weapons found may be seized and may be introduced in evidence against the person from whom they were taken. Id. at 29-30.

In examining whether the facts and circumstances surrounding a Terry search support an officer's "reasonable suspicion," of weapons, courts examine the totality of the circumstances.

Roggeman, 279 F.3d at 578. Here, for the reasons discussed above, the facts and circumstances of the pat down search support the officers' reasonable suspicions that Defendant was armed. The 911 caller had indicated that a person in the store had a gun, the officers observed a man in the store closely matching the description provided by the 911 caller, the man in question had one hand in his pocket and when the officers approached him, he appeared nervous and ran. He struggled with police and initially refused to remove his hands from his pockets and show them to police. In light of the totality of the circumstances, Officer Bottolfson had an objective, reasonable suspicion justifying the pat-down search of Defendant's person. Defendant's motion to suppress should therefore be denied.

### B.  Motion to Dismiss Indictment

Defendant seeks the Indictment's dismissal for lack of federal jurisdiction, contending that the circumstances of this case fail to establish a sufficient nexus with interstate commerce for the ongoing prosecution and that the offense charged does not pass Constitutional muster pursuant to United States v. Lopez, 514 U.S. 549 (1995).

Specifically, Defendant argues that although the Indictment states that he possessed a firearm in interstate commerce, no claim is made that he himself imported the gun into Minnesota from its place of manufacture, Massachusetts. Moreover, he argues, no allegation of any impact on interstate commerce is made other than the interstate shipment of the gun by someone, at some time, in the firearm's existence.

The Government responds that the element of interstate commerce is satisfied by proving that the firearm was manufactured in one state and recovered in another.

Pursuant to 18 U.S.C. § 922(g), "It shall be unlawful for any person . . . who has been

convicted in any court of a crime punishable by imprisonment for a term exceeding one year . . . [to] possess in or affecting [interstate] commerce, any firearm or ammunition . . . ." 18 U.S.C. § 922(g). The elements of the charge of felon in possession of a firearm require a showing beyond a reasonable doubt that: (1) the defendant has previously been convicted of a felony; (2) the defendant thereafter knowingly possessed a firearm; and (3) the firearm has been in or had affected interstate commerce. United States. v. Abfalter, 340 F.3d 646, 654 (8th Cir. 2003); United States v. Moore, 212 F.3d 441, 445 (8th Cir. 2000); United States v. Boyd, 180 F.3d 967, 978 (8th Cir. 1999); United States v. Anderson , 78 F.3d 420, 422 (8th Cir. 1996).

For purposes of interstate commerce, it is sufficient that there be "the minimal nexus that the firearm have [sic] been, at some time, in interstate commerce." United States v. Carter, 270 F.3d 731, 735 (8th Cir. 2001) (quoting Scarborough v. United States, 431 U.S. 563, 575 (1977)). The interstate commerce element is satisfied with proof that a firearm was manufactured in one state and recovered in another. Carter, 270 F.3d at 734. A firearm possessed by a convicted felon only needs to have traveled at some time in interstate commerce – it does not need to travel with the defendant in interstate commerce. See United States v. Rankin, 64 F.3d 338, 339 (8th Cir. 1995), cert. denied, 516 U.S. 1015 (1995). In Rankin, the Eighth Circuit held that the fact that the firearm was manufactured in a state other than the one in which it was found was sufficient to meet the interstate nexus requirement. Id. at 339. Moreover, a defendant need not have any involvement in how the firearm traveled to the state in which it was recovered and ownership of the firearm is irrelevant to the issue of possession. See United States v. Sianis, 275 F.3d 731, 734 (8th Cir. 2002).

Defendant cites United States v. Lopez, 514 U.S. 549 (1995), for the proposition that the

11

Indictment lacks an interstate commerce nexus sufficient to confer jurisdiction. In Lopez, the Supreme Court held that the Gun-Free School Zones Act was unconstitutional as it exceeded Congress's Commerce Clause authority, noting that the original Act lacked a "jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affect[ed] interstate commerce." 514 U.S. at 561. Following Lopez, the original Act was amended to add a jurisdictional element. See 18 U.S.C. § 922(q)(2)(A). In United States v. Shelton, 66 F.3d 991, 992 (8th Cir. 1995) (per curiam), cert. denied, 517 U.S. 1125 (1996), the Eighth Circuit upheld the constitutionality of 18 U.S.C. § 922(g) (criminalizing the act of being a felon in possession of a handgun) against a Lopez challenge. The court concluded that, because 922(g) contains an interstate commerce requirement, i.e., the firearm in question must have been shipped or transported in interstate commerce, the statute ensures through case-by-case inquiry that the firearm in question affects interstate commerce. Shelton, 66 F.3d at 992; see also United States v. Bates, 77 F.3d 1101, 1104 (8th Cir. 1996), cert. denied, 519 U.S. 884 (1996).

Applied to the facts of this case, the fact that the firearm in question apparently did not travel in Defendant's possession is not material to this Court's jurisdiction. The record reflects that the gun was manufactured in Massachusetts and seized in Minnesota. Because the interstate nexus requirement is met, this Court has jurisdiction. The Court therefore recommends that Defendant's motion be denied.

**IT IS HEREBY RECOMMENDED** that:

    1.    Defendant's Motion to Suppress Evidence (Doc. No. 52) be **DENIED**; and

    2.    Defendant's Motion to Dismiss Indictment (Doc. No. 61) be **DENIED**.

Dated: April 15, 2009

s/Susan Richard Nelson

SUSAN RICHARD NELSON
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by **April 30, 2009**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.